UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Charles K. Larson,

Plaintiff,

v.

Civil No. 00-350 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

Minnesota Chamber Business Service, Inc. Employee Welfare Plan; and Metropolitan Life Insurance Company,

Defendants.

---

Robert J. Hajek, Warchol, Berndt & Hajek, Minneapolis, Minnesota, for Plaintiff.

Kevin P. Hickey, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, Minnesota, for Defendant Metropolitan Life Insurance Company.

---

## Introduction

Plaintiff Charles K. Larson was a participant in the Minnesota Chamber Business Services Inc.'s Group Long Term Disability Insurance Plan ("the Plan"). Defendant Metropolitan Life Insurance Company ("MetLife") serves as the claims fiduciary for the Plan. Larson brought suit and asserted a claim pursuant to 29 U.S.C. § 1132(a)(1)(B) challenging MetLife's decision to deny him long term disability benefits. Before the Court is MetLife's Motion for Summary Judgment, brought on the grounds that, based on the administrative record, its benefits determination cannot be held to be arbitrary or



FILED NOV 28 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD NOV 28 2000
DEPUTY CLERK

capricious. For the reasons set forth below, the Court will grant MetLife's motion.

## Background

### I. Larson's Employment and Medical Treatment

Larson was hired by Modern Machine & Engineering ("MME") in 1954. (Statement of Claim for Long Term Disability Benefits (included in Sullivan Aff. Ex. B).) In 1998, Larson owned MME and was its President and General Manager. (Id.) Larson first became insured under the Plan on January 1, 1993. (Statement of Claim for Long Term Disability Benefits.) The Plan defines "disability" or "disabled" to mean that

> due to an Injury or Sickness, you require the regular care and attendance of a Doctor, and:
>
> 1. you are unable to perform each of the material duties of your regular job; and
>
> 2. after the first 36 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings; or
>
> 3. you, while unable to perform all of the material duties of your regular job on a full-time basis, are:
>
>    a. performing at least one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and
>
>    b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

(Sullivan Aff. Ex. A at 8 (Minnesota Chamber Business Services, Inc. Long Term Disability Plan).)

On August 31, 1998, Larson underwent surgery to treat colon cancer. (Sept. 3, 1998 Office Progress Note of Dr. Margaret Mac Rae at 1.)[1] The surgery involved removing a portion of Larson's sigmoid colon. (Diary Review Report at 1 (included in Sullivan Aff. Ex. B).) In the fall of 1998, Larson began a post-operative course of chemotherapy treatment. (Oct. 15, 1998 Office Progress Note of Dr. Mac Rae at 2.)

On December 9, 1998, Larson saw Dr. Steven R. Rousey for a follow-up visit and continuation of his chemotherapy treatment. (Dec. 9, 1998 Office Progress Note of Dr. Rousey at 1.) Dr. Rousey stated that Larson "reports tolerating [the chemotherapy] well with no significant mouth sores, nausea, vomiting, alopecia or any other symptoms."[2] (Id.) The physical examination revealed that Larson had lost six pounds since his last visit in mid-October and had lost 13 pounds compared with his weight in early October. (Id.) In view of Larson's "unexplained weight loss," Dr. Rousey stated that his weight was to be checked weekly during chemotherapy administration. (Id. at 2.)

For each dosage of chemotherapy Larson received, entries were made on an "Oncology Flow Sheet." Larson received chemotherapy on October 15, 22 and 29, 1998;

---

[1] Unless otherwise noted, all medical records cited in the background section are contained in Exhibit B to the Affidavit of Laura Sullivan.

[2] Alopecia means the loss of hair. Websters Third New International Dictionary at 60 (1986)

November 5, 12, and 20, 1998; December 9, 18, 23, and 31, 1998; and January 8 and 29, 1999. (Oncology Flow Sheets.) The "Oncology Flow Sheet" includes a section for recording whether Larson was reporting any symptoms relating to his chemotherapy. For the period from October 15, 1998 to January 29, 1999, there is only one such entry: on November 20, 1998, Larson reported "appetite problems." (Id.) That entry also stated, however, that Larson's weight was stable. (Id.) On December 9, 1998, a notation indicated that Larson "denies any complaints. Received chemo [without] incident." (Id.)

## II. Larson Submits Claim for Long-Term Disability Benefits

On December 4, 1998, Larson completed a MetLife Statement of Claim form for long term disability benefits. (Statement of Claim for Long Term Disability Benefits.) Larson stated that he was first disabled by sickness on August 24, 1998, and was unable to return to his job. (Id.) While Larson checked a box indicating that he had not performed any type of work since his disability, he also wrote below that entry "Some simple phone work, but otherwise nothing." (Id.) On his claims form, Larson identified three doctors who had treated him since the beginning of his reported disability: his regular family doctor, Dr. Needham; his surgeon, Dr. Elftman; and his oncologist, Dr. Mac Rae. At the bottom of the form, a notice directed Larson to

> attach a copy of any Social Security Award Certificate, Social Security Disability Denial Notice or other correspondence explaining a decision received from the Social Security Administration. If you have not yet applied for Social Security, please submit a copy of the decision when received.

(Id.) The Statement of Claim form also informed Larson that, by signing the claim form, he was authorizing "any medical professional, hospital, medical institution, pharmacy, governmental agency, present or prior employer(s), [or] insurance carrier(s)" to release its information about Larson upon presentation of the original or a photocopy of the form. (Id.) MetLife stated that it would use such information for claims evaluation and auditing purposes. (Id.)

As part of Larson's claim for disability benefits, he submitted an "Attending Physician's Statement" dated December 7, 1998, from Dr. Mac Rae. (Attending Physician's Statement of Functional Capacity.) Dr. Mac Rae identified the "primary diagnosis affecting work ability" as "colon carcinoma." (Id. at 1.) Dr. Mac Rae did not identify a secondary diagnosis affecting Larson's work ability. (Id.) Dr. Mac Rae indicated that her most recent examination of Larson had been on October 15, 1998. (Id.) She addressed Larson's ability to perform approximately twenty categories of physical activities and indicated that Larson had no limitation as to any of them.[3] (Id. at 2.) Dr. Mac Rae also indicated that Larson had no limitation on his cardiac functional capacity. (Id.) With respect to mental or nervous impairments, Dr. Mac Rae did not complete the

---

[3] The categories were as follows: Ability to drive; use of public transportation; walking; standing; sitting; change of position; assuming cramped or unusual positions; reaching forward or overhead; pushing/pulling/twisting; grasping/handling; finger dexterity; repetitive movement of the hands or feet; climbing; balancing; bending/stooping/squatting; operating a truck, dolly or small vehicle; operating heavy equipment; and concentrated visual attention.

lines for listing findings made "according to the DSM-III multiaxial classification."[4] (Id.) Nor did Dr. Mac Rae make Axis V findings, addressing Larson's ability to function under stress and engage in interpersonal relations. (Id.) She did, however, make "Axis IV findings," stating that Larson was "Class 1."[5] (Id.)

Dr. Mac Rae did not complete the section of the form entitled "Disability Evaluation." (Id.) Thus, Dr. Mac Rae did not indicate whether Larson was "now totally disabled," either "for his . . . own occupation" or "for any occupation." (Id.) Dr. Mac Rae also did not indicate a date on which Larson "was medically certified as unable to work." (Id. at 1.)

MetLife apparently received Larson's claim form on December 24, 1998. (Diary Review Report at 1 (included in Sullivan Aff. Ex. B).) MetLife requested and, on

---

[4] The DSM-III-R describes a multiaxial evaluation as involving five diagnostic axes: "Axes I and II comprise the mental disorders; Axis III, physical disorders and conditions; and Axes IV and V, severity of psychosocial stressors and global assessment of functioning, respectively. In its entirety, the multiaxial system provides a biopsychosocial approach to assessment." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (hereinafter "DSM-III-R") at xxv (3d ed., revised, 1987).

[5] Axis IV of the DSM-III measures "the overall severity of a psychosocial stressor or multiple psychosocial stressors that have occurred in the year preceding the current evaluation and that may have contributed to any of the following: (1) development of a new mental disorder; (2) recurrence of a prior mental disorder; or (3) exacerbation of an already existing mental disorder . . . ." DSM-III-R at 19. The severity of such psychosocial stressors is measured on a six-point scale, with a "6" indicating "catastrophic" severity. Id. at 11. A classification of "1" indicates that there are no acute events or enduring circumstances that may be relevant to the patient's mental disorder. Id.

January 14, 1999, received an "Employer Statement" from MME. (Disability Claim Employer Statement at 1 (included in Sullivan Aff. Ex. B).) The Employer Statement, completed by MME's Controller, indicated that Larson had last worked on August 21, 1998. (Id.) The Controller stated that Larson's position as "owner" of the business involved "office work and sales calls for the company." (Id. at 2.) The Controller stated that Larson's position required him to sit for between five and six hours a day, to stand for one to two hours a day, and to walk for one to two hours a day. The Controller also stated that "interpersonal relationships necessary to perform the job" occurred "continually," and that "stressful situations necessary to perform the job" occurred "frequently." (Id.)

On January 27, 1999, MetLife requested from Dr. Mac Rae's office a copy of Larson's "office notes and Chemo Flow sheets." (Facsimile from MetLife to Dr. Mac Rae (included in Sullivan Aff. Ex. B).) MetLife received those records on February 18, 1999. (Diary Review Report at 3.)

## III. MetLife Evaluates Larson's Claim

On February 22, 1999, MetLife completed its review of the medical records relating to Larson's cancer treatment and concluded that, based on those records and the Attending Physician Statement completed by Dr. Mac Rae, "it is unclear why [Larson] is unable to work partial or full-time," noting that the Employer Statement had described Larson's job as sedentary. (Id.) The MetLife employee indicated that the next step in

processing Larson's claim would be an interview with Larson, followed by a discussion with the case manager. (Id.) Immediately after making the foregoing note to the file, the MetLife employee telephoned Larson and, upon receiving no answer, left a voice mail message asking him to return the call. (Id.) MetLife's interview with Larson was to address (1) an overview of Larson's treatment plan, (2) what Larson saw as preventing him from performing sedentary occupation requirements, and (3) Larson's current day-to-day activities.

About ninety minutes later in the afternoon of February 22, 1999, Larson called MetLife asking to speak to the person who had left the message for him. (Diary Review Report at 4.) Larson requested a return call as soon as possible. (Id.) Larson called again on the following morning, February 23, at 8:25 a.m. (Id.) The MetLife employee returned Larson's call about two hours later, at 10:35 a.m., and spoke to a woman who said that Larson was not at home. (Id.) The woman asked the MetLife employee to call back at 2:00 that afternoon, at which time Larson would be home. (Id.) The MetLife employee agreed to call back then. (Id.) When the MetLife employee called Larson at approximately 2:23 p.m., the telephone rang eight times and was not answered. (Id.) At that point, the MetLife employee made a notation that no further attempts would be made to reach Larson. (Id.)

The MetLife employee then promptly wrote a report to the file stating that the objective medical information in the file indicated the following:

* the oncologist had placed no restrictions or limitations on Larson's activity;
* no date of leave had been indicated;
* no side effects from chemotherapy were noted; and
* the only note is of an "unexplained weight loss of six pounds over a period of two months" and Larson's weight being 195 pounds.

(Diary Review Report at 4.) The report further stated that the objective medical data indicated "no other abnormal" symptoms and did not support "severe symptoms that would limit [Larson] in sedentary occupation requirements." (Id.) Later in the afternoon of February 23, 1999, approximately ninety minutes after Larson had been scheduled to have his telephone interview, he called MetLife and asked the claims manager to update him on the status of his claim. (Id.) The following day, February 24, MetLife telephoned Larson and told him he would be notified by mail of a decision. (Id.)

On March 1, 1999, MetLife sent Larson a Notice of Benefits Denial letter. (Letter from Marie Walton, LTD Case Manager, to Larson dated Mar. 1, 1999 (included in Sullivan Aff. Ex. B).) After quoting the Plan's definition of "disability," Walton indicated that MetLife had reviewed Larson's medical records from Drs. Mac Rae and Rousey. (Id. at 1.) Walton recited the results of Larson's physical examination by Dr. Rousey at the December 9, 1998 office visit, indicating that nothing abnormal was noted. (Id. at 1-2.) Walton further observed that, in connection with Larson's chemotherapy, he has denied having any side effects or complaints. (Id. at 2.) Finally, Walton cited to Dr.

Mac Rae's "Attending Physician Statement," on which she had checked that Larson had no limitation as to approximately twenty physical activities. (Id.) Based on the foregoing, MetLife found that Larson did not meet the policy's definition of being "disabled." The letter advised Larson that he could make a written request for a review of the claim "no more than 60 days after you receive notice of denial of the claim." (Id.) The letter further advised Larson that, in requesting a review, he should state why he believed his claim was improperly denied and submit any request to review pertinent documents. Larson was also advised of his right to submit "additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration." (Id.) Larson did not appeal MetLife's decision within the time frame set forth in the letter.

## IV. Larson Appeals MetLife's Denial of Long Term Disability

On July 26, 1999, Larson's then-counsel, Michael Perlman, sent a letter to MetLife requesting a review and redetermination of Larson's claim. (Letter from Michael Perlman to Marie Walton dated July 26, 1999 (included in Sullivan Aff. Ex. B).) With that letter, Perlman enclosed a copy of a Notice of Award letter which Larson had received from the Social Security Administration ("SSA") finding that Larson became disabled under the SSA's rules on August 22, 1999. (Letter from SSA to Larson dated June 18, 1999.) Larson's counsel asserted that "the determination by Social Security [that Larson became disabled on August 22, 1998] is prima facie evidence that Mr. Larson has

become disabled and is eligible for benefits under his private LTD policy." (July 26 letter to Walton (emphasis in original).)

On August 9, 1999, MetLife acknowledged receipt of Perlman's letter as an untimely request for review of MetLife's March 1 decision to deny benefits. (Letter from Renay Bryant, LTD Case Manager, to Perlman Law Office (included in Sullivan Aff. Ex. B).) MetLife stated that Larson must provide a written explanation as to why Larson's request for review had been untimely made. (Id.) The letter stated that "[a]ny and all reasons for the delay in giving us notice of appeal must be set forth in writing, and [Larson] should advise of any medical, vocational or other data supporting his claim for continuing disability." (Id. (emphasis added).)

Perlman responded to MetLife by letter, stating that Larson "was unable to submit his appeal notice before April 30, 1999 . . . because he was medically incapacitated and under the care of a licensed psychologist." (Letter from Perlman to Bryant dated Sept. 13, 1999 (included in Sullivan Aff. Ex. B).) Perlman provided the name and telephone number of Larson's psychologist and stated that the psychologist could verify his representation regarding Larson's incapacitation. Perlman further indicated that Larson was unable to file his appeal prior to April 30 "because he did not receive notice of the disability award from the social security administration until June 18, 1999." (Id.)

On September 20, 1999, MetLife advised Perlman that Larson's appeal request was being reviewed. (Letter from Bryant to Perlman (included in Sullivan Aff. Ex. B).)

MetLife indicated that "[i]f it is determined that additional information is needed to complete our review, we will notify you accordingly." (Id.) MetLife stated that Perlman would be advised in writing within 60 days as to MetLife's decision or whether additional time was required to complete its review. (Id.)

On November 4, 1999, MetLife telephoned Dr. Mac Rae's office and requested a return call from either the doctor or a nurse. (Diary Review Report at 6.) On November 8, a MetLife employee spoke to someone from Dr. Mac Rae's office who mistakenly stated that Dr. Mac Rae had prepared an "Attending Physician Statement" for Larson reflecting his status as of April of 1999. (Id. at 7.) After further discussions between MetLife and Dr. Mac Rae's office, the latter advised MetLife on November 9 that the "Attending Physician Statement" in Larson's chart was in fact from December of 1998. (Id.) On November 10, 1999, MetLife received confirmation from Dr. Mac Rae's office that there had been no change in Larson's condition since he had begun chemotherapy. (Id.)

On November 10, 1999 MetLife sent a letter to Larson stating that it was reaffirming its prior decision to deny him long term disability benefits. (Letter from Sherrie Edwards, Disability Resource Specialist, to Larson at 1 (included in Sullivan Aff. Ex. B).) After again setting out the Plan's definition of "disability" and "disabled," MetLife indicated that it had reviewed the medical records from Drs. Mac Rae and Rousey. (Id. at 1-2.) MetLife indicated that Dr. Mac Rae's Attending Physician

Statement "does not support that you were functionally impaired from performing the job duties of a President/Owner." (Id. at 2.) MetLife further stated that

> For final clarification regarding your condition and treatment, we contacted Dr. MacRae's office on November 9, 1999 to verify that there was no additional information that may support that you have been functionally impaired due to chemotherapy. We were informed that there has been no change in your status since the onset of chemothcrapy.

(Id. (emphasis added)) MetLife therefore concluded that its initial decision to deny benefits was valid. (Id.)

On December 7, 1999, Larson's counsel sent a letter to MetLife asking why Larson's long term disability benefits had not commenced in light of the SSA's determination to award Larson disability benefits. By a letter dated January 5, 2000, MetLife responded that its determinations to deny benefits were reasoned and informed decisions based on the Plan's definition of "disability." This action followed.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must

view the evidence, and the inferences which may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.2d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but rather must demonstrate the existence of specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986); Krenik v. County of Le Sueuer, 47 F.3d 953, 957 (8th Cir. 1995). The court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. See Liberty Lobby, 477 U.S. at 249, 106 S. Ct. at 2511. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992).

## II. Judicial Review of the Denial of Long-Term Disability Benefits under ERISA

The parties do not dispute that the Plan is a multi employer benefit plan subject to ERISA. Nor do the parties dispute that the Plan gives MetLife discretion to interpret the Plan and determine eligibility for benefits. The Plan provides:

> In carrying out their respective responsibilities under the Plan, the Plan

> administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.

(Sullivan Aff. Ex. A at 26.) In light of these two undisputed facts, it would appear that the appropriate standard of review for MetLife's decision to deny benefits is an "abuse of discretion" or "arbitrary and capricious" standard. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989).

Larson argues, however, that there has been either "a palpable conflict of interest or a serious procedural irregularity" that "caused a serious breach of the plan administrator's fiduciary duty" to Larson. See Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). Accordingly, Larson urges the Court to apply a less deferential standard of review, to be determined by a "sliding scale" approach that takes into account the nature and scope of MetLife's purported conflict of interest or irregular conduct. Larson contends that the Court should afford the administrator's decision no deference and enter a judgment awarding him long-term disability benefits. Alternatively, Larson asserts that, because MetLife failed to fully and fairly develop the administrative record regarding his claim, the Court should remand the matter back to MetLife for a new determination based upon an expanded record. The Court begins with whether the "sliding scale" approach set forth in Woo applies to the facts of this case.

### A. The Availability of a Less Deferential Standard of Review.

#### *1. A Palpable Conflict of Interest*

The Eighth Circuit has recognized that, generally, when the insurer is also the plan administrator, there is "something akin to a rebuttable presumption of a palpable conflict of interest." Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 947-48 (8th Cir. 2000) (citing Barnhart v. UNUM Life Ins. Co. of Am., 179 F.3d 583, 587-88 (8th Cir. 1999)). A plan administrator can negate the presumption of bias by coming forward with evidence of "ameliorating circumstances, such as equally compelling long-term business concerns that militate against improperly denying benefits despite the dual role." Id. at 948 (internal quotation marks omitted). Here, MetLife is both the insurer and the plan administrator. Based on the record before it, this Court finds the Eighth Circuit's reasoning in Schatz relevant here:

> [G]iven the corporate identity (and, thus, the attending structural and financial conflict of interest) between Mutual as insurer and Mutual as plan administrator, and given that Mutual has articulated no ameliorating circumstances to overcome this structural bias, we conclude that the plan administrator was operating under a palpable conflict of interest.

Schatz, 220 F.3d at 948. The same can be said of MetLife in this case.

The finding of a palpable conflict of interest, however, does not end the Court's inquiry under Woo. Larson must also present "material probative evidence" that the palpable conflict of interest "actually caused a serious breach of the plan administrator's fiduciary duty to [him]." Schatz, 220 F.3d at 948. The Eighth Circuit has noted that this

requirement "presents a considerable hurdle for plaintiffs." Barnhart, 179 F.3d at 588 n.9. "The evidence offered by the claimant must give rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Id. at 589 (internal quotation marks omitted).

This Court is mindful that "[w]hen the administrator is a large corporation, the firm has a financial interest, but the award in any one case will have only a trivial effect on its operating results." Perlman v. Swiss Bank Comprehensive Disability Protection Plan, 195 F.3d 975, 981 (7th Cir. 1999). Furthermore, the plan administrator's fiduciary obligations extend "primarily to the plan as it relates to all beneficiaries, not just to individual claimants." Barnhart, 179 F.3d at 589 (emphasis added). Finally, "[c]orporations act through agents, and these agents usually lack any stake in the outcome." Perlman, 195 F.3d at 981. The Court finds no basis to support a conclusion that MetLife's benefit staff is biased against claimants or that the actions of MetLife's employees were the product of either a whim or an arbitrary decision due to MetLife's financial interest in the Plan. Accordingly, the conflict of interest advanced by Larson is not sufficient to trigger a less deferential standard of review.

### *2. Serious Procedural Irregularities*

Larson also argues that MetLife failed to develop the record fully and fairly; therefore, a less deferential standard of review is warranted. In support of this argument, Larson points to several shortcomings in MetLife's investigation of his claim. With

respect to MetLife's initial review of the claim, Larson complains that MetLife failed to contact any doctor other than his oncologist and failed to obtain information from Larson himself in an employee interview. With respect to MetLife's review of Larson's appeal, Larson points out that MetLife failed to contact the licensed psychologist identified in Mr. Perlman's letter of September 13, 1999 and failed to obtain a copy of the SSA's file regarding its decision to award Larson long-term disability benefits. Larson contends that these irregularities are sufficiently serious to warrant a less deferential review and the reversal of MetLife's benefit determination. Assuming that the omissions Larson has identified satisfy the first prong of Woo, there is insufficient evidence to establish that those irregularities caused a serious breach of MetLife's fiduciary duty to Larson.

Contrary to Larson's assertion, there is no genuine issue of material fact as to whether the September 13, 1999 letter from Larson's counsel was likely to have put MetLife on notice of a disability arising from mental impairments. The Plan requires the claimant to furnish written notice of a claim for long-term disability benefits and, in his proof of claim, "describe the event, the nature and the extent of the cause for which a claim is made." (Sullivan Aff. Ex. A at 17.) Larson acknowledges that he did not specifically list a mental impairment on his initial application for disability benefits. (Pl.'s Mem. Opp'n to Summ. J. at 11.) The only "diagnosis affecting work ability" that was presented to MetLife was colon cancer. Larson knew that MetLife had based its initial decision to deny benefits on a determination that Larson's colon cancer and

subsequent chemotherapy treatment had been reported as imposing no limitations on Larson's abilities. Larson never amended or supplemented his description of "the event, the nature and the extent of the cause for which a claim is made."[6] (Sullivan Aff. Ex. A. at 17.) As the Eighth Circuit has noted, "ERISA does not require [a] plan administrator to assess an 'alternative diagnosis to the one submitted for benefits . . . much less to determine whether that alternative diagnosis constitutes a total disability.'" DuMond v. Centex Corp., 172 F.3d 618, 622 n. 9 (8th Cir. 1999) (quoting Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 382-83 (7th Cir. 1994)). Accordingly, the Court concludes that there is no genuine issue of material fact as to whether MetLife's failure to investigate a disability arising from mental impairments has a connection to MetLife's substantive decision that Larson was not impaired due to his colon cancer.[7] See Barnhart, 179 F.3d at 588-89.

---

[6] Larson advised MetLife that he had been unable to timely make an appeal because he was "medically incapacitated and under the care of a licensed psychologist" in the spring of 1999.

[7] The record indicates that, contrary to the assertion of Larson's counsel to MetLife, Larson had not been "under the care of a licensed psychologist." Larson had been referred to Dr. Selin by the Minnesota Disability Determination Services for a psychological evaluation in connection for his application for Social Security Disability Benefits. (Aff. of Charles Larson dated July 24, 2000, Ex. 5 at 1 (May 4, 1999 Minnesota Social Security Disability Consultative Evaluation by Dr. Selin.).) As of Dr. Selin's evaluation, Larson had seen no psychiatrists and had seen a social worker at Behavioral Health Services once, on October 6, 1998. (Id. at 2.) Dr. Selin's primary assessment was that Larson had an "alcohol-induced persisting amnestic disorder" which seriously affected his ability to function. (Id. at 7.)

Nor is there a genuine issue of material fact as to whether MetLife's failure to obtain a copy of the SSA's file on appeal caused a breach of its fiduciary duty to Larson. The only reference in the Plan to SSA awards is a section entitled "Reduction of Benefits," which provides that MetLife reserves the right to reduce the employee's monthly disability benefit by estimating Social Security benefits. (Sullivan Aff. Ex. A. at 12.) It further provides that, when the employee receives final approval or denial of a claim from the SSA, MetLife has the right to adjust the monthly benefit payable to the employee and require that the employee refund any overpayments. (Id. at 13.) Thus, the Statement of Claim form Larson completed for MetLife required Larson to apply for Social Security Disability benefits and to notify MetLife when SSA rendered a decision.

Several courts have recognized that SSA benefit determinations are not binding on ERISA plan administrators. Ezell v. Dan River Inc., 117 F. Supp. 2d 534 (W.D. Va. 2000) (collecting cases); see also Block v. Pitney Bowes Inc., 952 F.2d 1450, 1455-56 (D.C. Cir. 1992) (according no weight to SSA determination of disability where Social Security award rested in part on medical reports never submitted to ERISA plan fiduciary). Larson has not argued that the standards that govern a determination of being disabled used by the SSA are similar to the Plan's standards for being disabled. See Elliott v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999) (reasoning that consideration of an SSA finding of disability should depend, in part, on the presentation of some evidence that the "disability" definitions of the agency and the Plan are similar); cf.

Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 950 n.9 (8th Cir. 2000) (noting that different standards of disability govern social security and ERISA determinations). Nor is there evidence in the record from which one could infer that Larson's SSA file would shed any light on whether Larson's colon cancer -- as opposed to some other physical or mental condition -- rendered him "disabled" for purposes of the Plan. The Court concludes that there is insufficient "material probative evidence" to support a finding that MetLife's failure to obtain Larson's SSA file "actually caused a serious breach of the plan administrator's fiduciary duty." Schatz, 220 F.3d at 948.

Finally, the omissions relating to MetLife's initial review of the claim cannot be said to have caused a breach of MetLife's fiduciary duty to Larson. MetLife fully advised Larson of the bases for its decision to deny benefits. In the March 1, 1999 denial letter, MetLife informed Larson that he had a right to review MetLife's claim file and submit "additional medical or vocational information, and any facts, data, questions or comments you deem appropriate for us to give your appeal proper consideration." Thus, Larson had a clear intervening opportunity to correct any omissions in the record initially developed by MetLife. If either Larson's family doctor or the surgeon who performed the resection of his colon had relevant information that MetLife had missed, Larson had the opportunity to call it to MetLife's attention in his appeal. He did not. Nor did Larson submit to MetLife any vocational information, medical records or other facts explaining why his colon cancer left him unable to perform the material duties of his regular job.

In light of the foregoing, the Court determines that there is no genuine issue of material fact as to whether the procedural irregularities noted by Larson resulted in an arbitrary decision by MetLife or a decision that was the product of MetLife's whim. See Barnhart, 179 F.3d at 589. Accordingly, Larson is not entitled to the less deferential "sliding scale" standard set forth in Woo. The Court will review MetLife's benefits determination under an abuse of discretion standard.[8]

**B. Review of MetLife's Decision to Deny Benefits.**

Under a traditional abuse of discretion standard, a plan administrator's denial of benefits "will stand if a reasonable person could have reached a similar decision." Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 767 (8th Cir. 2000). In determining reasonableness, the Court must consider "whether the decision is supported by substantial evidence, which is more than a scintilla but less than a preponderance." Woo, 144 F.3d at 1162 (quotation omitted). The Court is mindful that the administrator's decision should not be disturbed if it supported by a reasonable explanation, regardless of whether a different reasonable determination could have been made. See Schatz, 220 F.3d at 949.

---

[8] Larson alternatively argued that there is sufficient evidence to raise a fact question as to whether MetLife fully and fairly developed the administrative record, necessitating a remand. The Court disagrees. Larson's argument assumes that MetLife had an obligation to assess all possible bases for finding a disability, including those not identified in Larson's statement of claim. As set forth above, such an assumption is contrary both to the language of the Plan and case law. Furthermore, unlike the situation presented in Woo, there is no evidence that, with respect to Larson's diagnosed colon cancer, MetLife either ignored or overlooked available and relevant medical or vocational evidence. The Court concludes that there is no basis for a remand..

In making this assessment, the Court only considers the evidence before the plan administrator. Id.

The Court is satisfied that MetLife's determination that Larson's colon cancer had not rendered him "disabled" under the terms of the plan was supported by substantial medical evidence in the record. Accordingly, the Court concludes that there is no genuine issue of material fact as to whether MetLife's benefits determination was arbitrary or capricious.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED THAT** Defendant MetLife's Motion for Summary Judgment (Doc. No. 18) is **GRANTED** and Plaintiff Charles Larson's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 28, 2000

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES: NOV 28 2000

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*